560 P.2d 504

**DEPARTMENT OF EMPLOYMENT,**
Plaintiff-Respondent,

v.

**BAKE YOUNG REALTY,**
Defendant-Appellant.

No. 12159.

Supreme Court of Idaho.

Feb. 22, 1977.

Randall C. Fredricks, Clemons, Cosho, Humphrey & Samuelsen, Boise, Roger L. Williams, Schiller, Williams & Trabert, Nampa, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., R. LaVar Marsh, Roger B. Madsen, Asst. Attys. Gen., Boise, for plaintiff-respondent.

BISTLINE, Justice.

In 1974, the Idaho legislature amended the state's Employment Security Law to provide a specific exemption from "covered employment" for

> "Service performed by an individual for a real estate broker as an associate real estate broker or as a real estate salesman, if all such service performed by such individual for such person is performed for remuneration solely by way of commission." I.C. § 72-1316(a)(10)(B)

The result was to exempt real estate brokers from payment into the state's employment security fund for the services of their commissioned real estate salesmen. Assuming that this represented a change in a pre-existing policy, the Department of Employment notified Idaho's real estate brokers that they were in arrears for their payments from April 1, 1972, to July 1, 1974, the effective date of the new amendment exempting them from coverage. "Emergency" legislation was passed by the 1975 legislature to prevent this assessment, but was vetoed by the Governor as interest group legislation. The veto was not over-ridden.

Bake Young Realty then brought the present challenge which, by agreement between the Idaho Association of Realtors and the Department of Employment, is to stand as a "test case." A hearing was held on May 29, 1975, before Appeals Examiner Subia of the Department of Employment. His decision, holding commissioned real estate salesmen to be "covered" for purposes of the State Employment Security Law, was issued on July 9, 1975, and was affirmed by the Industrial Commission in an Order of January 8, 1976. We reverse.

I.

The sole question on appeal is whether services provided by commissioned real estate salesmen for real estate brokers were exempted from the definition of "covered employment" prior to the effective date of the 1974 amendment. I.C. § 72-1316(d), the statute in effect at all times relevant for this case, provides:

> "(d) Services performed by an individual for remuneration shall, for the purposes of the Employment Security Law, be covered employment:
> (1) Unless it is shown:
> (A) that the worker has been and will continue to be free from control or direction in the performance of his work, both under his contract of service and in fact, and
> (B) that the worker is engaged in an independently established trade, occupation, profession, or business; . . ."

Condition (A) is not the source of the dispute. The typical broker/salesman contract which was put in evidence in this case recites that the two parties find it to their "mutual advantage" to enter into the agreement. The broker, in exchange for 40% of the commissions earned on each sale, promises to provide a fully equipped office, to pay for all office expenses (such as postage, telephones and advertising), and to assist the salesman in closings. The salesman, for his part, contracts to be diligent in his efforts to promote the broker's business and to abide by all Idaho laws relative to real estate brokers and salesmen. Either party can terminate the contract on ten days' written notice to the other, in which case all supplies and records become the property of the broker. All listings secured by the salesman remain his own personal property. Explicitly, the contract states:

> "The salesman is to be deemed an independent contractor under the law and is to do nothing to change that status. The salesman is not to be deemed a servant, employee, joint adventurer or partner of the broker."

Moreover, the testimony at the examiner's hearing was uncontradicted in affirming that Mr. Johnson, Bake Young Realty's

salesman, functions quite independently. He makes his own hours, provides his own transportation, pays his own licensing fees and other work-related expenses, has his own separate listings and negotiates his own deals.

There would seem, then, to be little argument that "both under his contract of service and in fact," Mr. Johnson is and will continue to be free from the control or direction of Mr. Young.

But our inquiry cannot stop here. I.C. § 72–1316(d) is not phrased in the disjunctive. The worker must be free from direction and control in the performance of his work, *and* be engaged in an independently established trade, occupation, profession or business. The real issue in this case, then, is whether, under the laws governing the real estate business—I.C. §§ 54–2021 to 2051—real estate salesmen can be said to be engaged in an independent business. The Department of Employment insists that Idaho's real estate laws and regulations vest ultimate responsibility for the protection of the general public in the broker. That being the case, the Department argues, the broker has *the right* to control the activities of his salespeople, regardless of whether or not that right is exercised in fact.

By statute, it is clear that the broker *does* have the ultimate responsibility to the public. No salesman can operate apart from the place of business of a licensed broker, I.C. § 54–2038, and any salesman may be "discharged *by his employer* for a violation of any of the provisions of section 54–2040". I.C. § 54–2047. The Real Estate Commission's rules and regulations, passed pursuant to the enabling statute, I.C. § 54–2047, spell out the means whereby the broker must exercise his responsibility to the public. They require the salesman to turn over payments to the broker, who is alone to deposit and be responsible for such trust funds. The broker alone is permitted to perform the closing. The salesman is said to be licensed through the broker, the "employer," who has the right to terminate his "employee," the salesman. For similar reasons, the Department of Employment argues, this Court has held barbers "covered" under the Employment Security Law. *Byrd v. Employment Security Agency,* 86 Idaho 469, 388 P.2d 100 (1964).

We find *Byrd* to be distinguishable in critical particulars. In that case, a barber, who admittedly had been an employee of the master barber, entered into an agreement whereby he would become an independent lessee of part of the premises. Henceforth, he was to keep his own receipts and records, pay his own taxes and social security contributions, and maintain his own independent schedule and mode of operation. The Court ruled, nonetheless, that his services were "covered" employment and the master barber must contribute into the state employment security fund. Crucial to that ruling was the Court's interpretation of the state's Barber Law. The Court held, first, that the "legislature never anticipated that the principal-independent contractor relationship would exist in a barber shop"; second, that the enforcement mechanism placed the master barber in the position of being the one whose license would be revoked should the entire shop, or any part of it, fail to comply with the requirements of the Department of Public Health; and, finally, that the goals of the statute could not be met without the master barber exercising control over the details of the work performed by the other barbers.

The general test of whether the right to control is sufficient to give rise to the relationship of employer and employee is whether or not the control extends to " ' . . . the details of the work, the manner, method, or mode of doing it, the means by which it is to be accomplished, or, specifically, the details, manner, means or method of doing the work, as contrasted with the result thereof.' " *Merrill v. Duffy Reed Construction Co.,* 82 Idaho 410, 415, 353 P.2d 657, 660 (1960); *Moore v. Idaho Employment Security Agency,* 84 Idaho 1, 367 P.2d 291 (1961); *Beutler v. MacGregor Triangle Co.,* 85 Idaho 415, 380 P.2d 1 (1963).

Applying this test, the Court found that a master barber, to meet the public health requirements, was responsible for supervising the cleanliness of each portion of his shop, seeing that all tools were kept in sanitary condition, and maintaining standards of personal hygiene among all the barbers in his shop. The Court concluded that this "statutory obligation to supervise the work in so far as it in any manner affects the public health . . . [was] sufficient to create the employer-employee relationship." *Byrd v. Employment Security Agency, supra,* 86 Idaho at 474, 388 P.2d at 102.

The Real Estate Law, by contrast, clearly envisions a relationship between broker and salesman other than that of employer-employee. The real estate salesman is defined as

" . . . any person employed, either directly or indirectly, by a real estate broker, *or* who represents a real estate broker in the performance of any of the acts above set forth." (Emphasis added.) I.C. § 54–2022

The statute repeatedly refers to carrying on "the business of real estate broker *or* real estate salesman" thus indicating a recognition that the two are separate professions. *See,* I.C. §§ 54–2021, 2029(A)(2), 2040.

The enforcement mechanism mirrors this recognition. The broker and salesman are separately licensed; their respective licenses are of a different quality. Each is given separate duties and responsibilities such as the keeping of adequate records on all property transactions, accounting for all moneys received, and abiding by all licensing regulations. The salesman is directly controlled by and responsible to the Real Estate Board, and must forfeit his license in the event of misconduct.

Finally, insofar as the broker himself is responsible for protecting the public from misconduct by the salesmen who represent him, we find that he exercises that responsibility by supervising *the results,* rather than the *detailed performance of the work.* Thus, we are unconvinced by the contention of the Department of Employ-

ment—adopted by the Appeals Examiner and affirmed by the Industrial Commission—that a statute placing ultimate responsibility for protecting the public upon the broker confers upon him a "right to control" his salesmen such that only an employer-employee relationship can logically exist between the two.

Rather, we find persuasive the reply given by the California Supreme Court, when faced with this precise question more than thirty years ago:

"The Real Estate Act, supra, does not establish as a matter of law the status of every salesman as being 'in employment' within the meaning of the Unemployment Insurance Act. The licensing statute was not promulgated for that purpose; it was designed for the protection of the public, the primary function being to allow only those persons to operate as real estate brokers and salesmen who are honest, truthful, and of good reputation. [Citations omitted.] The act operates in a comparatively narrow field and the legislation should not be interpreted so as to give a meaning beyond its realm and scope. . . . The Real Estate Act of this state does not expressly give the employer the right to control the manner and means of accomplishing the result desired, nor do its provisions conclusively negative all of the other factors to be considered in determining whether one is an independent contractor." *California Employment Stabilization Commission v. Morris,* 28 Cal.2d 812, 172 P.2d 497, 500 (1946).

This Court was faced with a fact pattern remarkably similar to the present case in *Moore v. Idaho Employment Security Agency,* 84 Idaho 1, 367 P.2d 291 (1961). The case involved the question of whether services provided by salesmen selling shares in mutual funds constituted "covered employment" for the stock broker, Allied Mutual Funds, Inc. (AMFI). There, as here, salesmen were forbidden to operate independently of a broker whom they were to represent, all moneys were turned over to AMFI which periodically paid the estab-

lished commissions, and the broker was ultimately responsible for protecting the public, by reason of which responsibility he was empowered to terminate any salesman guilty of misconduct. The Court, nonetheless, found the salesmen to be independent contractors:

"AMFI's right to control is primarily the exercise of supervision to assure compliance with applicable rules, regulations and statutes of those bodies which regulate and control the sale of securities for the asserted purpose of protecting the public. We stated in the National Trailer Convoy case that requirements of a truck driver to meet Interstate Commerce Commission standards and existence of road patrols point toward compliance with governmental regulations; and these are not indicia of an employer-employee relationship. AMFI is required to terminate the relationship if any of its representatives violates regulatory provisions which govern its business. A representative's license to sell is predicated upon his compliance therewith and it is understood to be axiomatic that loss of license terminates selling privileges." *Moore v. Idaho Employment Security Agency*, supra, 84 Idaho at 6, 367 P.2d at 293. *And see, National Trailer Convoy, Inc. v. Employment Security Agency*, 83 Idaho 247, 360 P.2d 994 (1961).

We hold, therefore, that whatever "right to control" is, by implication, conferred upon a broker by the state's real estate laws is not such either as a matter of law, or under the facts of this case, as to render services provided by his salesmen "covered employment" within the meaning of the Employment Security Law.

## II.

The Appeals Examiner reached his conclusion by yet another route. Relying upon this Court's decision in *Swayne v. Department of Employment*, 93 Idaho 101, 456 P.2d 268 (1969), that

" . . . the latest amendment of I.C. § 72–1316(d) has broadened the scope of that provision . . . by requiring that a nonemployee be both free from control *and* engaged in independently established business." 93 Idaho at 104, 456 P.2d at 271.

he concluded that the services of real estate salesmen are "covered employment" because they do not measure up to the tests announced in *Swayne* for determining when one was "engaged in an independently established trade, occupation, profession or business."

The Court in *Swayne* had proposed the following three questions as important factors in making this determination:

(1) Did the lessee have authority to hire subordinates?

(2) Did the lessee own major items of equipment?

(3) Would either party be liable to the other for a peremptory termination of the business relationship?

93 Idaho at 105, 456 P.2d 268. The Court found no trouble in ruling that the "employee" in *Swayne*—a mobile trailer court lessee and operator—passed all three tests with flying colors and thus could be said to be "engaged in an independently established" business. Subsequent cases have made it clear that the factors mentioned in *Swayne* were not intended to present the Court's exhaustive analysis, much less to institute a facile checklist for mechanical application:

" . . . we have never held that the fulfillment of this third factor, *or of any one factor,* was a prerequisite to a finding that the worker is engaged in an independent business." (Emphasis added.) *Hammond v. Department of Employment,* 94 Idaho 66, 68–69, 480 P.2d 912, 914 (1971); *Totusek v. Department of Employment,* 96 Idaho 699, 535 P.2d 672 (1975).

With this caution in mind, it is apparent that application of the first "factor" is inconclusive in the present context. True, real estate salesmen generally do not hire subordinates, but then they have no occasion to do so. Should they care to do so, say for accounting or clerical purposes, nothing would stand in their way.

The Appeals Examiner ruled that real estate salesmen do not measure up to the second test of owning major items of equipment because they do not generally provide their own office furniture (though, in this case, Mr. Johnson did so). This is too narrow a reading of *Swayne,* prompted perhaps by the test's origin in *National Trailer,* a case involving truckers who owned their own rigs. The point is not whether the salesman owns major pieces of tangible equipment for the business, but whether he incurs substantial out-of-pocket professional expenses which are not reimbursed. In *Link's School of Business, Inc. v. Employment Security Agency,* 85 Idaho 591, 380 P.2d 506 (1963), on facts quite similar to the present case, the Court remarked:

> "The salesmen furnished their own automobiles or modes of conveyances and paid all their attendant expenses, which constitutes a mark of the independent contractor relationship". 85 Idaho at 524, 380 P.2d at 508.

Here, in addition to his transportation expenses, the salesman pays for his own cards and licensing fees, his dues in professional organizations, and for any expenses incurred in entertaining or otherwise dealing with his clients. None of these expenses are reimbursed, regardless of whether or not they lead to a successful outcome.

The third test of *Swayne,* namely, "the right to terminate the relationship without consequence" has been held by this Court to be "the strongest indication that a worker is not an independent business man." *Swayne v. Department of Employment, supra,* 93 Idaho at 105, 456 P.2d at 273. In the present case, the statute requires a broker to discharge any salesman guilty of violating the real estate law, and the contract between the parties gives either side the right to terminate their relationship upon ten days' notice. Admittedly, one can make a stronger case for being an "independent contractor" if one can point to damages which will accrue in case of default upon a formal contractual relationship. Nevertheless, this Court has repeatedly held that the ability to discharge or terminate a relationship without liability is not in and of itself conclusive. Indeed, "No one test standing alone, except the right of control in the relationship of employer and employee, and the lack of such right in that of principal and independent contractor is wholly decisive." *Link's School of Business, Inc. v. Employment Security Agency, supra,* 85 Idaho at 519, 380 P.2d 506; *and see* cases cited therein.

That the three tests of *Swayne* are not the only applicable criteria, is clear from the fact that *National Trailer*—the case they were drawn from—itself utilized still other criteria. In that case, for example, "the driver's control of his route, of the garaging and upkeep of his truck, his privilege of refusing a haul" were seen as factors tending to "indicate the status of an independent contractor." *National Trailer Convoy, Inc. v. Employment Security Division, supra,* 83 Idaho at 253, 360 P.2d at 997. Similarly, the Court in that case quoted approvingly from 56 C.J.S. Master and Servant § 3(8):

> "Payment for a result or by the job is an indicia that the relationship is one of contractee and independent contractor, whereas payment for the performance of work indicates a master-servant relationship."

In *Beutler v. MacGregor Triangle Company, supra,* 85 Idaho at 421, 380 P.2d at 4, the Court found further "indicia of the principal-independent contractor relationship" in the fact that the principal did not withhold income tax or social security excise from the trucker's earnings. Finally, in *Moore v. Idaho Employment Security Agency, supra,* the Court noted "a strong indication of the relationship of principal and independent contractor" in the fact that "AMFI did not direct the hours of work nor the period of the day such work was carried on." 84 Idaho at 6, 367 P.2d at 294.

When measured by any of these criteria, appellant's real estate salesmen, at all times pertinent to this case, emerge as practitioners of an independent occupation. The evidence is clear that his salesmen were

free to make their own hours and develop their own techniques of salesmanship. They were not required to attend any office meetings. They were paid only by commission, regardless of the amount of time worked. No taxes or other deductions were withheld from their commissions. They were free to negotiate deals with other salesmen (in which case Bake Young receives his usual commission) or with other brokers (in which case Bake Young receives nothing). They were frequently possessed of substantial real estate and other business interests aside from their occupation as licensed real estate salesmen. In short, the true employers of the real estate salesmen are the clients who engage their services in order to sell or to purchase property. Because of this, some jurisdictions have gone so far as to hold that the true relationship between salesmen and brokers is that of joint adventurers:

"  .   .   .   the association of plaintiff [the broker] and the salesmen is in the nature of a joint venture, in which each party to the arrangement makes certain contributions and performs certain services in order to produce a result mutually profitable to them. Plaintiff contributes its offices, office equipment and personnel, and such information as it may have, or such real estate listings as it may receive, and its efforts to close deals made by the salesmen, and to collect the commissions. The salesmen contribute their time and effort, the expense of seeking out prospective purchasers or borrowers and procuring from them contracts for the purchase of real estate or applications for loans. Each apparently considers that the arrangement is to their advantage. If it develops that it is not, either may terminate it at any time. Plaintiff is no more the employer of the salesman than it is their employee. Neither is in the employment of the other. Each performs his function, and receives his remuneration, not from the other, but from a third party. Plaintiff collects the commissions, and turns over to the salesmen their proportion thereof, but in so doing it acts merely as a collecting agen-

cy pursuant to its agreement with the salesmen. If no commission is collected, the loss falls, not on plaintiff, but on both. Neither is performing the work of the other. Each is performing his allotted function in the joint enterprise." *Realty Mortg. & Sales Co. v. Oklahoma Employment Security Commission,* 197 Okl. 308, 169 P.2d 761, 764–5 (Okla.1946).

Regardless of the label or rationale relied upon, in the majority of jurisdictions called upon to deal with this question, the same result has been reached, namely, that real estate salesmen, working on a commission basis, are not within the kind of employment which is "covered" by the unemployment or social security acts. Annot., 29 A.L.R.2d 746 (1953).

Based on our own case law in Idaho, we are in agreement with the majority, and hold that real estate salesmen are engaged in an independent occupation and thus are not "covered" employees for purposes of the state's employment security law. Determination reversed. Costs to appellant.

McFADDEN, C. J., and DONALDSON, SHEPARD and BAKES, JJ., concur.